**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Dennis J. WILLIAMS, Defendant–
Appellant.**

**No. 96–2557.**

United States Court of Appeals,
Seventh Circuit.

Argued April 8, 1997.

Decided Oct. 30, 1997.

Richard H. Lloyd (argued), Office of the United States Attorney, Criminal Division, Fairview Heights, IL, for Plaintiff–Appellee.

Eric W. Butts (argued), St. Louis, MO, for Defendant–Appellant.

Before EASTERBROOK, KANNE, and DIANE P. WOOD, Circuit Judges.

KANNE, Circuit Judge.

A jury found Dennis Williams guilty of being a felon in possession of a firearm. The district court sentenced him as an Armed Career Criminal. Williams raises three chal-

lenges to his conviction and one to his sentence. We reject them all.

## I. HISTORY

On March 11, 1995, Dennis Williams ("Williams") and his girlfriend Darcell Franklin ("Darcell") were shopping at the St. Clair Mall in Fairview Heights, Illinois. Williams drew the attention of other shoppers in the parking lot because he had somehow locked himself inside Darcell's car and was calling for help. Shoppers brought Williams' plight to the attention of mall security, who helped him out of the car and then called the Fairview Heights Police Department to report the odd incident.

A Fairview Heights police officer checked Darcell's license plate against their computer files and found that the plates were suspended and expired. The expired plates, however, bore a current registration sticker in Williams' name. After learning of an outstanding warrant for Williams' arrest, the officer followed Williams and Darcell out of the parking lot and pulled them over. He arrested Williams immediately on the outstanding warrant. A search of the car revealed two guns, prompting police to arrest Darcell as well.

Police questioned Williams briefly en route to the station, to no avail. They booked Williams and Darcell and placed them in separate cells. Some time later, around 1:00 a.m., police questioned Williams again. He admitted owning one of the guns. There is no dispute that police properly gave Williams his Miranda warnings.

On March 12, Darcell telephoned her mother, Alaina Franklin ("Alaina"), from the police station. Darcell allegedly told her that Williams was not the owner of the guns, but he claimed ownership of them in order to protect Darcell. Presumably Darcell needed Williams' protection since Darcell had no permit to carry guns and the serial number on one of the guns was scratched off. Darcell also telephoned her friend, Valerie Johnson ("Johnson"). She allegedly restated the story to Johnson, i.e. that Williams had claimed the guns in order to protect her.

Williams was a heroin addict with a habit costing $200–400 per day. While he sat in jail after his arrest, he began to suffer withdrawal symptoms. Withdrawal can, occasionally, be life threatening. On March 12, 1995, one day after Williams' arrest, a county doctor administered 60 mg of phenobarbital to counteract the withdrawal effects. Williams took two more 30 mg doses sometime on March 13.

On March 13 at around 1:00 p.m., Fairview Heights police officers and an agent from the Bureau of Alcohol, Tobacco and Firearms interviewed Williams. Williams made an oral statement which the ATF agent transcribed. In his statement Williams admitted owning one of the guns. Later, the ATF agent and police officers testified that Williams did not seem ill or out of sorts. One officer testified that he seemed a bit "jumpy," but no more than an average criminal defendant might seem during an interview with police.

Williams was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Before trial, the defense attempted to suppress Williams' statements on the ground that Williams' drug use, withdrawal, or use of phenobarbital made his statements involuntary. The court refused to suppress that evidence. At trial, Williams called Johnson and Alaina to testify. They would have testified that Darcell called them from jail and told them that the guns were not actually Williams', but the district court sustained the prosecution's hearsay objections. Williams argued at trial that Congress lacks the authority to regulate firearms. The district court rejected this argument. The jury found Williams guilty. Because Williams had three prior felony convictions, the district court sentenced Williams as an Armed Career Criminal under 18 U.S.C. § 924(e).

## II. ANALYSIS

Williams raises four arguments on appeal. First, he claims that the district court erred in refusing to suppress his statements. Second, he claims that the district court should have allowed Johnson and Alaina to testify to the substance of their conversations with Darcell. Third, Williams reasserts his posi-

tion that Congress lacks the authority to regulate firearms. Finally, he submits for the first time that one of his convictions should not have been included in the § 924 calculation because his civil rights were restored after he served his sentence for that conviction. We address Williams' four claims in turn.

### A. The Confessions

■ The district court held a suppression hearing to decide whether to admit Williams' confession. After hearing the evidence, the district court determined that the confession was voluntary, and thus admitted it into evidence. We review the ultimate question of whether the confession was voluntary *de novo*, *see United States v. D.F.*, 115 F.3d 413, 419 (7th Cir.1997), but we review the district court's determination of the facts for clear error, *id.*

■ A trial court may admit a confession into evidence only if the accused made it voluntarily. *See Colorado v. Connelly*, 479 U.S. 157, 166, 107 S.Ct. 515, 521, 93 L.Ed.2d 473 (1986); *Brown v. Mississippi*, 297 U.S. 278, 285–86, 56 S.Ct. 461, 464–65, 80 L.Ed. 682 (1936). Williams argues that his confession was not voluntary because the phenobarbital in his system acted as a "truth serum." He relies on *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *overruled in part by Keeney v. Tamayo–Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), for the proposition that a confession obtained through the use of truth serum is involuntary. In *Townsend*, the defendant received an injection of phenobarbital mixed with hyoscine. *See id.* He produced evidence that he had no memory of confessing. Rather, he only remembered flickering lights, someone telling him to keep his head up, and an officer telling him that he had confessed to murder. *See id.* at 300–01, 83 S.Ct. at 750–51. A medical expert testified that hyoscine acts as a truth serum, and phenobarbital could enhance the effect. *See id.* The Supreme Court held that "[i]t is difficult to imagine a situation in which a confession would be less the product of a free intellect, less voluntary, than when brought about by a drug having the effect of a 'truth

serum.' " *Id.* at 307–08, 83 S.Ct. at 754. Since the state court did not make a factual finding that the confession was voluntary before admitting it into evidence, the Court remanded the case for a new suppression hearing. *See id.* at 298, 83 S.Ct. at 749–50.

In the case at hand, the government produced evidence that when Williams made his first statement, he was not behaving unusually. Williams' expert testified that after six hours without heroin, an addict would start to withdraw, exhibiting symptoms such as diarrhea, intense nausea, yawning, and goose pimples. Williams produced evidence that at that questioning, which took place around 1:00 a.m., he was sleepy.

Williams took phenobarbital between his first statement and his March 13 statement. Police testified that at the time of his March 13 statement, Williams said he had not slept well, but he was not exhibiting any strange body movements. He appeared no different then he did at the time he made his first statement, before having taken any phenobarbital. He was a little bit "jumpy," but enunciated clearly, did not sweat, and did not act unusually. Williams' expert testified that phenobarbital can act to reduce inhibitions.

The district court announced its ruling orally after hearing the evidence. The court found that the defendant's sleepiness at the first statement was attributable to the time of day and not to narcotics use, stating that "I don't think that proves that his statement was involuntary and there is no other evidence before the Court at this time of the defendant's condition at that time other than that offered by the Government that he exhibited no signs of addiction." Tr. of Suppression Hr'g at 54. The district court found that the defendant exhibited some withdrawal symptoms before his March 13 interview, but showed no effects from taking phenobarbital. Indeed, the district court found that

> there is nothing before the Court from any witnesses or even from the interview of the correctional officers at the county jail, from anyone, that the defendant exhibited any symptoms associated with the administering of the phenobarbital. So absent that, the Court cannot leap to the conclusion that he exhibited the tendency to have

a loosened tongue caused by the use of this drug.

*Id.* at 57.

We find no reason to disturb the district court's findings. The district court listened to the evidence presented and made findings in light of and relying on that evidence.

As to the ultimate question of whether the confession was voluntary, Williams argues that the district court failed to consider the holding of *Townsend v. Sain*, that a confession given as a result of tongue-loosening drugs is involuntary. In light of the district court's finding that Williams' tongue was not loosened by the phenobarbital, we agree with the district court that his confession was not, at least for that reason, involuntary. *Townsend* did not announce a blanket rule that all defendants who confess after taking narcotics have confessed involuntarily. Rather, *Townsend* held that a confession given as a result of taking a truth serum is involuntary. *Townsend*, 372 U.S. at 307–08, 83 S.Ct. at 754. Here, based on the district court's findings that Williams was not affected by the phenobarbital, we affirm the decision to admit the confession into evidence.

### B. Hearsay Rulings

▮▮▮ Williams argues that the district court improperly excluded the hearsay testimony of two defense witnesses, Johnson and Alaina. We review evidentiary rulings for abuse of discretion. *See United States v. Zizzo*, 120 F.3d 1338, 1351 (7th Cir.1997). Finding no abuse, we affirm.

At trial, Darcell testified to the following incidents: After she and Williams were arrested, she told police that both guns were hers. Actually, only one gun belonged to her while the second belonged to her friend Dave. She telephoned two people from the police station—her friend Johnson and her mother Alaina. She told both women that Williams had claimed ownership of both guns in order to protect her. On cross-examination, she testified that she did not know that authorities were charging Williams with a federal offense until the indictment, that she did not tell the Bureau of Alcohol, Tobacco and Firearms that the guns were not Williams', and that she did not call the Unit-ed States Attorney or the police to tell them the guns were not Williams'.

The defense then called the two women whom Darcell had telephoned from the police station to testify about the substance of their conversations with Darcell. The prosecution objected to their testimony as hearsay. The district court sustained the prosecution's hearsay objections and did not let either testify as to the substance of the calls.

Williams contends that the district court erred in excluding their testimony. He believes that the purpose of the prosecution's cross-examination was to suggest that Darcell recently fabricated her story that the guns were not Williams'. By showing that Darcell did not contact the authorities to report the true ownership of the guns, Williams argues, the prosecution has made it appear that Darcell invented this story for purposes of trial. Williams further asserts that the prosecution attempted to prove that Darcell's motive to fabricate the story arose only when she learned that Williams was under indictment, and not before. Therefore, according to Williams, he was entitled to submit the testimony of Johnson and Alaina, who would have confirmed that Darcell told them the guns were hers long before the indictment.

▮▮▮ Federal Rule of Evidence 801(d) provides:

A statement is not hearsay if—(1) [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive. ...

Fed.R.Evid. 801(d). We use a four-part test for determining whether a statement is not hearsay because it is offered to rebut a charge of recent fabrication: "1) the declarant testifies at trial and is subject to cross-examination; 2) the prior statement is consistent with the declarant's trial testimony; 3) the statement is offered to rebut an express or implied charge of recent fabrication or improper motive; and, 4) the statement

was made *before* the declarant had a motive to fabricate." *United States v. Fulford,* 980 F.2d 1110, 1114 (7th Cir.1992) (citing *United States v. Lewis,* 954 F.2d 1386, 1391 (7th Cir.1992)). In the past the circuits were split as to whether the Rules of Evidence required the statement to pre-date the motive to fabricate. The Supreme Court has recently said that it must. *See Tome v. United States,* 513 U.S. 150, 158–61, 115 S.Ct. 696, 702, 130 L.Ed.2d 574 (1995). If the four requirements are not met, then the testimony is presumed to be inadmissible hearsay. We address the four requirements in that order.

The first requirement is obviously met. Darcell testified at trial on direct and cross-examination. The second requirement is likewise met. According to the defense, Johnson and Alaina would have testified that Darcell told them that the guns did not belong to Williams. This is consistent with Darcell's own testimony that she told the two women that Williams had claimed ownership of the guns in order to protect her.

■ The third and fourth requirements, however, are not so easily met. The third requirement is that the statement be offered to rebut a charge of recent fabrication. We are not certain that the prosecution expressly or impliedly charged Darcell with recent fabrication by eliciting her testimony that she did not call the Bureau of Alcohol, Tobacco and Firearms or other authorities to report that Williams did not own the guns. That testimony could be interpreted to show that Darcell recently fabricated the story that the guns are not Williams', but it could also be interpreted to suggest that she simply told the same story to some people and told others nothing. Where the prosecution has only shown that the witness did not tell her story to everyone, without showing that she is telling a new and different story at trial, the prosecution has not crossed over the line from impeachment of credibility to a charge of recent fabrication. "One may impeach for lack of credibility without going so far as to charge recent fabrication.... We will not find abuse of discretion where, as here, the impeachment is susceptible of either interpretation." *Thomas v. United States,* 41 F.3d 1109, 1119–20 (7th Cir.1994). It is not an abuse of discretion to exclude testimony which has no function other than bolstering a witness.

Likewise, the fourth requirement, that the statements be made before the motive to fabricate arises, is not met here. The defense asserts that the motive to fabricate arose when Darcell learned that Williams was under indictment, but this is not the only possibility. Darcell was with Williams during his arrest. Knowing about Williams' criminal record, Darcell could well have thought then that Williams should not be carrying a gun. In this case, as in many instances when the court must decide what motivates human behavior, "[r]easonable minds can differ as to when [Darcell] may have first possessed a motive to fabricate." *Fulford,* 980 F.2d at 1114. Because the four requirements are not indisputably met, we hold it was not an abuse of discretion to sustain the prosecution's hearsay objections and exclude Johnson's and Alaina's testimony as to the substance of their phone calls with Darcell.

## C. Congress' Power to Regulate Firearms

■ Williams argues that the Commerce Clause does not provide Congress with the power to regulate firearms; therefore, § 922(g)(1), which prohibits felons from possessing firearms, must be unconstitutional. Williams relies on *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), which held 18 U.S.C. § 922(q) unconstitutional as exceeding Congress' power under the Commerce Clause. *Lopez* has spawned countless unavailing arguments; Williams' is among them.

Our Circuit has already held that Congress has authority under the Commerce Clause to pass § 922(g)(1) because subsection (g) contains its own provision that the possession must be "in or affecting interstate commerce." § 922(g)(1); *see United States v. Bell,* 70 F.3d 495, 498 (7th Cir.1995); *United States v. Lewis,* 100 F.3d 49, 51 (7th Cir. 1996); *United States v. Lee,* 72 F.3d 55, 58 (7th Cir.1995). We note that every other circuit which has addressed this issue has held likewise. *See United States v. Smith,* 101 F.3d 202, 215 (1st Cir.1996), *cert. de-*

**1134**

nied, —— U.S. ——, 117 S.Ct. 1345, 137 L.Ed.2d 503 (1997); *United States v. Trzaska,* 111 F.3d 1019, 1028 (2d Cir.1997); *United States v. Gateward,* 84 F.3d 670, 672 (3d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 268, 136 L.Ed.2d 192 (1996); *United States v. Wells,* 98 F.3d 808, 811 (4th Cir.1996); *United States v. Rawls,* 85 F.3d 240, 242 (5th Cir.1996); *United States v. Murphy,* 107 F.3d 1199, 1211 (6th Cir.1997); *United States v. Barry,* 98 F.3d 373, 378 (8th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1014, 136 L.Ed.2d 891 (1997); *United States v. Henson,* 1997 WL 478657 *4 (9th Cir. Aug. 21, 1997); *United States v. Bolton,* 68 F.3d 396, 400 (10th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 966, 133 L.Ed.2d 887 (1996); *United States v. Adams,* 91 F.3d 114, 114 (11th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 623, 136 L.Ed.2d 546 (1996). We reject Williams' challenge to the constitutionality of § 922(g)(1).

### D. Sentencing as an Armed Career Criminal

▪ Finally, Williams argues that he should not have been sentenced as an Armed Career Criminal under 18 U.S.C. § 924(e). That statute requires a minimum sentence of fifteen years for anyone convicted under 18 U.S.C. § 922(g) who has three previous felony convictions. An exception to § 924(e) provides that the government may not use a prior conviction to enhance a sentence if the sentencing jurisdiction has restored the defendant's civil rights. 18 U.S.C. § 921(a)(20). Williams argues that Missouri restored his civil rights after his 1976 conviction, and therefore that conviction may not be used to enhance his sentence. We affirm Williams' sentence because his civil rights are not restored in Missouri.

▪ Williams did not raise this issue at his sentencing hearing. Therefore, we will examine the district court's decision for plain error only. *See* Fed.R.Crim.P. 52(b); *Unit-*

*ed States v. Brookins,* 52 F.3d 615, 623 (7th Cir.1995); *United States v. Livingston,* 936 F.2d 333, 335 (7th Cir.1991), *cert. denied,* 502 U.S. 1036, 112 S.Ct. 884, 116 L.Ed.2d 787 (1992). "We reverse for plain error only when convinced that it is necessary in order to avert an actual miscarriage of justice." *United States v. Maholias,* 985 F.2d 869, 877 (7th Cir.1993).

▪ The Seventh Circuit has previously addressed what constitutes restoration of civil rights for purposes of § 921(a)(20). We have held before that failure to restore the rights to vote, hold public office, or serve on a jury precludes a finding of sufficient restoration of rights. *See United States v. McKinley,* 23 F.3d 181, 183 (7th Cir.1994); *see also Roehl v. United States,* 977 F.2d 375, 377 (7th Cir.1992), *cert. denied,* 510 U.S. 825, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993) (holding civil rights not restored for purposes of § 921(a)(20) because Wisconsin law prohibits felons from holding public office); *United States v. Erwin,* 902 F.2d 510, 512 (7th Cir. 1990), *cert. denied,* 498 U.S. 859, 111 S.Ct. 161, 112 L.Ed.2d 127 (1990) (holding civil rights not restored for purposes of § 921(a)(20) because Illinois law prohibits convicted felons from owning guns and still counts conviction for purposes of recidivist laws). A statute generally restoring the civil rights of all prisoners when they complete their sentences is insufficient for purposes of § 921(a)(20) if the state continues to withhold some rights from felons. *See Roehl,* 977 F.2d at 377 (holding civil rights not restored for purposes of § 921(a)(20) notwithstanding Wisconsin statute restoring civil rights on completion of sentence); *Erwin,* 902 F.2d at 512 (holding civil rights not restored for purposes of § 921(a)(20) notwithstanding Illinois statute restoring civil rights on completion of sentence). With this general rule in mind, we turn to Missouri law.[1]

We understand Missouri law to restore some, but not all, civil rights to felons on

---

1. Missouri adopted a new criminal code effective January 1, 1979. Williams was convicted in 1976 and released in 1979. The parties assume that we are to apply Missouri law as it existed when Williams was convicted, rather than the law as it existed when he was released. There is no need for us to decide which is correct, be-

cause the new criminal code withheld as many or more privileges from convicted felons as the old obfuscated code had. *See* Mo. Stat. Ann. §§ 561.021, 561.026 (1979). This issue has not been briefed, and it has no impact on the outcome of this case. We deem it prudent to save the question for another day.

completion of their sentences. Missouri had at least two statutes in effect in 1976 that prohibited convicted felons from holding public office.[2] First, convicted felons could not run for or hold the office of sheriff. *See* Mo.Rev.Stat. § 57.010 (1969); *State ex inf. Peach v. Goins,* 575 S.W.2d 175, 179 (Mo. 1978). Second, they could not be highway patrolmen. *See* Mo.Rev.Stat. § 43.060 (1969). These positions were unavailable to felons despite a Missouri statute which purported to restore civil rights to felons on completion of their sentence. *See Magruder v. Petre,* 690 S.W.2d 830, 831 (Mo.Ct.App. 1985) ("[T]he legislature intended by the enactment of the later statute [making felons ineligible to be sheriff] to except from the rights and privileges of citizenship to which the convicted felon was restored upon discharge from bench parole the right or privilege to hold the office of county sheriff."). Williams presented no evidence that his civil rights were restored beyond what Missouri law provided for him automatically. Since Missouri law as a whole withholds some rights from felons, the automatic restoration provided to all released felons is insufficient for purposes of § 921(a)(20). *See Roehl,* 977 F.2d at 377; *Erwin,* 902 F.2d at 512. Since Missouri does not restore all of the civil rights required to satisfy the § 921(a)(20) exception, we hold that it was not plain error for the district court to include Williams' 1976 conviction among the three convictions required for enhanced sentencing under § 924(e).

For the reasons given above, we AFFIRM the district court's judgment and sentence.

---

**2.** The Eighth Circuit has addressed this very issue in an unpublished opinion. *See Lapinsky v. United States,* 1995 WL 644987 (8th Cir. Nov. 3, 1995). They reached the same conclusion that we do today, that Missouri's statute automatically restoring a felon's civil rights on completion of the sentence does not restore civil rights sufficiently to satisfy § 921(a)(20). *See id.* at *1.